UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

NORTHLAND SALES, INC.,

        Plaintiff,

       v.                      Case No. 05-C-0453

MAAX CORPORATION,

        Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. # 29) AND DENYING PLAINTIFF'S MOTION TO
SUPPLEMENT AFFIDAVITS OR IN THE ALTERNATIVE GRANTING LEAVE TO
TAKE FURTHER DEPOSITIONS (DOC. # 51)

        Defendant, Maax Corporation (Maax), a Canadian corporation, sells and

distributes bathtub and whirlpool products throughout the United States. Northland Sales,

Inc. (Northland), a Wisconsin corporation, was a manufacturer's representative for Maax

and its predecessor Aker Plastics. (PPFOF ¶ 1.) After a nearly twenty-five-year business

relationship between Northland representatives and Maax/Aker, Maax terminated

Northland as its representative. Northland then brought suit in Waukesha County Circuit

Court alleging that Maax violated provisions of the Wisconsin Fair Dealership Law, Wis.

Stat. ch. 135, and seeking rescission of a 2003 Agreement between Northland and Maax.

Maax removed the action to this court based on diversity of the parties pursuant to 28

U.S.C. §§ 1332 and 1441(a). Maax' Motion for Summary Judgment, and Northland's

Motion to Supplement Affidavits in Opposition to Defendant's Motion for Summary

Judgment are now before the court.

# STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

BACKGROUND

Northland, a Wisconsin Corporation with its principal place of business in New Berlin, Wisconsin, acts as a representative for over thirty manufacturers producing an array of products, including faucets, whirlpools, sump pumps, septic tanks, drains, grease traps, pipes, toilets. (DPFOF ¶ 4; Pl.'s Resp. to DPFOF ¶ 4; Rinehart Aff. Ex. J.)[1] Northland's president is Gerald Mellone; his two sons, Stephen and Jeffery Mellone, are full-time employees. (PPFOF ¶ 10; G. Mellone Dep. 9.) Prior to the relationship with Gerald Mellone, Aker had no significant distribution system in Wisconsin. (PPFOF ¶¶ 2, 4, 8.)

Mellone and Aker started their business relationship in 1988. Northland was incorporated in 1994, and pursuant to an oral agreement between Mellone and Aker, Northland became a manufacturer's representative for Aker Plastics commencing in 1988. (DPFOF ¶ 9; Pl.'s Resp. ¶ 9; G. Mellone Dep. 17-18, 28; S. Mellone Dep. 7.) The agreement provided that Northland would not sell products that competed with Aker, but it would sell other manufacturers plumbing products that complimented Aker's product line. (PPFOF ¶ 9.) As a manufacturer's representative, Northland would contact and solicit orders from wholesalers who would then buy products directly from Aker, take title, inventory the products, and then resell them to consumers. (G. Mellone Dep. 110-11.) Products would be sent by Aker to the wholesaler. (G. Mellone Dep. 111.) Northland then earns a commission on the Aker products that are bought by wholesalers. (G. Mellone Dep. 111-13.)

---

[1] Defendant's Proposed Findings of Fact (DPFOF) and Plaintiff's Proposed Findings of Fact (PPFOF) are cited in this order if the fact identified is either asserted by both parties as undisputed, or if the dispute between the parties as to that fact is immaterial or not compliant with Civil Local Rule 56.2 (governing the submission and responses to proposed findings of fact on summary judgment).

3

On occasion, Northland would inform wholesalers how to look for damage on Maax/Aker products when they would be dropped off by Maax/Aker delivery trucks. Relatedly, in an attempt to help the wholesaler distinguish damaged units from nondamaged units, Northland would visit wholesalers who were rejecting a shipment due to damage. (G. Mellone Dep. 137-39). On an "emergency basis," occasionally Northland would hold Maax/Aker products for short periods for a customer to pick up. (*Id.* at 243.) If a product was damaged and had to be "back ordered" by a wholesaler, periodically Mellone would use his trailer to pick up a unit from one place and deliver it as needed. (*Id.* at 146-47.)

Often, Northland would get calls for repair work. When a call would come in, it was typical for a Northland representative to ask questions about the product and then forward it to Aker for repair. Independent companies in the region were authorized and paid by Maax to do repairs on Maax products; Northland was not one of them. (*Id.* at 262-64.) However, if a problem was minor, a Northland representative may go out and inspect the product to see if he or she could fix it. (*Id.* at 258-59.) On occasion, Maax would ask Northland if it could either send one of its representatives or get a third party to work on a problem if a Maax representative was unavailable. (*Id.* at 260, 265.) Northland "did this on a gratis basis." (*Id.* at 260.) For promotional purposes, Northland maintained displays of Aker products to show to customers and to take to trade shows; however, Northland did not otherwise inventory Aker products. (*Id.* at 119-20.)

In October 2002, Maax, a foreign corporation with its principal place of business in Montreal, Quebec, Canada, (Joint Pretrial Rep. 1), purchased Aker Plastics and its Aker brand of bathtub products. (DPFOF ¶ 19.) Maax manufactured and

4

distributed other brands of bathroom and whirlpool products, and had its own sales representatives in the United States, though its presence in Wisconsin was small. (*See* DPFOF ¶ 20). In late 2002, Gary Aker, who after Maax' purchase of Aker became Maax Wholesale Development Manager, sent a letter to agencies representing Maax/Aker, announcing that in some sales territories, Maax would seek to limit representation to one company. (Rinehart Aff. Ex. N; PPFOF 14.) It requested that each agency provide Maax with a business profile. (Rinehart Ex. N; G. Mellone Dep. 163.)[2] Northland complied with Maax' request and submitted a business plan. (DPFOF ¶ 22; Pl.'s Resp. to DPFOF ¶ 22; G. Mellone Dep. 165-67.)

At a meeting between Maax representatives and Northland in February 2003, Maax offered Northland a Sales Representation Contract. (G. Mellone Dep. 176, 179-80.) Gary Aker presented the contract to Gerald Mellone, noting that while they had worked together "on a handshake all these years," the contract was a corporate issue and that Mellone had to sign it. (G. Mellone Dep. 179-80.) Mellone signed the contract. (*Id.* at 180.)

Entitled "Sales Representation Agreement," (henceforth "contract" or "Agreement") the contract states that Northland would serve as Maax' "exclusive sales representative" for "Aker by Maax" and "Manhattan by Maax" products in Wisconsin and the Upper Peninsula of Michigan. (Rinehart Aff. Ex. G ¶¶ 1-2.) Northland was to solicit and receive orders from plumbing wholesalers in the region, and obtain commissions on products sold and distributed by Maax to those wholesalers. Product price levels would

---

[2] Because there was no overlap between Aker and Maax representatives in Northland's territory, there was no plan to consolidate representatives in this area. (Smith Aff. ¶ 18.)

5

be set by Maax and all commissioned sales were subject to Maax' directions, procedures, specifications, and prior approval. (*Id.* ¶ 5.) In addition, the contract limited Northland's use of Maax' trademarks and other commercial symbols and prohibited Northland from competing with Maax. (*Id.* ¶ 4.2-4.3.)

The term of the contract was from April 1 through December 31, 2003, and would be renewed annually unless either party gave the other thirty-days notice of nonrenewal. (*Id.* ¶ 3.) In addition, under the terms of the contract, either party was permitted to terminate the sales representation agreement by providing the other party with thirty-days notice or as otherwise required by law; and Maax was permitted to terminate the agreement immediately "for cause" as that term was defined in the contract. (*Id.* ¶ 7.) Moreover, the contact terms could be modified only by a written instrument signed by the parties. (*Id.* ¶ 11.4.)

The contract also defined the relationship of the parties, noting that neither had the authority to "assume or create any obligation or responsibility, express or implied, on behalf of the other party, without prior written approval and acceptance by the other party in each instance." (*Id.* at ¶ 8.) Additionally, the contract was to represent "the entire agreement and understanding among the parties relative to the subject matter herein, and supersedes any prior agreements and understandings relating to such subject matter." (*Id.* ¶ 11.)

Northland was party to similar contracts with its other manufacturers, (Rinehart Aff. Ex. F)[3], and despite the new agreement with Maax, there was no significant

---

[3] Exhibit F of the Rinehart Affidavit includes three contracts signed by Gerald Mellone on behalf of Northland as a manufacturer's representative for other companies. Specifically, the contracts are with Seachrome Corporation, Lewis Pipe Company, and Hydro-Action Industries/AK Industries. For example,

change in how Northland functioned as a representative of Maax/Aker. (PPFOF ¶ 17; DPFOF ¶ 40.) Maax continued to manufacture the Aker products and sell the products through the same distribution network. (PPFOF ¶ 13.) Northland recommended wholesalers for approval by Maax, and on occasion Maax refused to permit a wholesaler to purchase Maax products even though it was recommended by Northland. (DPFOF ¶ 42; Pl.'s Resp. to DPFOF ¶ 42.) Although the commission structure differed slightly, Northland found that it made more money under the new structure. (G. Mellone Dep. 197-98.)

Northland continued to promote many other manufacturers' products, and Maax trademarks and commercial symbols were displayed along side those of other manufacturers. (DPFOF ¶¶ 44-45; Rinehart Aff. Ex. I.) Northland's sales territory was consistently among one of the top-producing territories in the country for Maax/Aker products. (PPFOF ¶ 20.) Sales of Aker products ranged from 37% to 43% of Northland's income from 1999 to 2004. (PPFOF ¶ 19.)

Northland sold some "Manhattan by Maax" products, which were new under the contract. (G. Mellone Dep. 190-91.) After a few sales, Maax shifted the Manhattan line to another representative. (G. Mellone Dep. at 194-95.)

For marketing program purposes, Maax would contribute up to one-percent of a wholesaler's annual sales to a marketing account, and permit the wholesaler to spend money in that account on Maax promotional items, including literature. (G. Mellone Dep. 271-73.) Northland, as the Territory Manager for the marketing program, would review and

---

in a contract between Seachrome Corporation and Northland dated 1994, Northland is designated as a independent manufacturer's representative, it is to receive commissions on sales, and either party may terminate the contract by giving thirty-days notice. During his deposition, Mellone affirmed that these contracts were current and valid and not signed under duress. (G. Mellone Dep. 249-50, 253, 257.)

complete forms; however, Maax would have had to approve a request before money from the marketing account would be released.  (*Id.* 296-97.)

On October 18, 2003, Ryan Crowell, Maax' Central Regional Sales Manager, issued a letter to Gerald Mellone at Northland informing him that Maax was terminating Northland as its Wisconsin sales representative.  (Rinehart Aff. Ex. H; G. Mellone Dep. 211-13.) The letter indicated that the termination would be effective as of November 30, 2003, pursuant to the terms of the contract.  (Rinehart Aff. Ex. H.)

While the loss of Maax/Aker as a manufacturer was detrimental to Northland's business, Northland maintained other manufacturers and picked up new manufacturers. (G. Mellone Dep. 226-29.) As of February 2, 2006, Northland represented thirty-seven manufacturers.  (Rinehart Aff. Ex. J.)  Vehicles, trailers, and other equipment that it owned before and after Maax' purchase of Aker continue to be used by Northland in representing other manufacturers.  (G. Mellone Dep. 237-239, 295.)

DISCUSSION

Northland presents two arguments for the court's consideration: (1) Maax' decision to terminate its business relationship violated the Wisconsin Fair Dealership Law (WFDL); and (2) the 2003 Agreement between Maax and Northland is invalid.  These arguments are addressed in turn.

A. Wisconsin Fair Dealership Law

"The [Wisconsin Fair Dealership Law] was enacted to protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.*, 398 F.3d 962, 965 (7th Cir. 2005).  It "was meant to protect only those small

8

businessmen who make a substantial financial investment in inventory, physical facilities or 'good will' as part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealership." *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 313 N.W.2d 60, 63 (1981). "No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor." Wis. Stat. § 135.03.

Protection under the WFDL is limited to those entities "deemed 'dealerships,' which [the Seventh Circuit] has recognized is a term of art defined under the WFDL as (1) a contract, (2) by which the dealer is granted the right to sell or distribute goods, or use a trade name, trademark or the like, and (3) in which there is a 'community of interest.'" *Sales & Marketing Assoc., Inc. v. Huffy Corp.*, 57 F.3d 602, 605 (7th Cir. 1995) (*citing Frieburg Farm Equipment Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992); Wis. Stat. § 135.02(3). As noted above, Maax/Aker and Northland had a contract (though Northland alternatively disputes the validity of the agreement, as will be discussed later). Hence, the parties focus their arguments on the second and third elements noted above.

The first question to be addressed is whether Northland can prove it had the right to sell or distribute Maax products, in accordance with Wisconsin Statutes § 135.02(3).[4] In addressing this issue, courts consider the relationship of the parties.

---

[4] Northland does not specifically argue, and the record does not support the proposition, that it was granted the right to use Maax trade names or trademarks in a manner consistent with designating a dealership under the WFDL. While the record indicates that Northland displayed Maax/Aker trademarks in advertisements along side those of other manufacturers, such use is not covered under Wis. Stat. § 135.02(3). *See E.A. Dickinson & Assoc. v. Simpson Elec. Co.*, 509 F. Supp. 1241, 1245-46 (E.D. Wis. 1981).

9

In determining whether a plaintiff has a right to sell under the WFDL, the "most important factor . . . is the dealer's ability to transfer the product itself (or title to the product) or commit the grantor to a transaction at the moment of the agreement to sell." *John Maye Co. v. Nordson Corp.*, 959 F.2d 1402, 1406 (7th Cir. 1992). In *John Maye Co.*, the plaintiff acknowledged that its contract reserved to the defendant the right to accept or reject any customer offer. *Id.* However, the plaintiff argued that the totality of the circumstances made this fact inconclusive. The plaintiff pointed out that it occasionally modified prices, assumed credit risk for lesser sales, installed and serviced equipment after delivery, maintained an inventory of spare parts for the defendant's products, and that the defendant never rejected a proposed sale. *Id.* The Seventh Circuit rejected this theory, finding that a right to sell under the WFDL cannot exist without the actual ability to commit the grantor to a sale no matter how substantial the representative's responsibilities.

> That Maye did more than required by the contract is insufficient to demonstrate a modification and a right to sell, as "the performance of additional service-type functions by a manufacturer's representative does not suffice to bring one which neither sells nor distributes goods within the meaning of the WFDL.

*Id.* at 1408 (*quoting E.A. Dickinson & Assocs. v. Simpson Elec. Co.*, 509 F. Supp. 1241, 1245 (E.D. Wis. 1981)); *see also Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262, 265 (7th Cir. 1983) ("Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the WFDL; however, where a sales representative merely solicits orders that are subject to the manufacturer's approval, no such investment has occurred."); *Foerster, Inc.*, 105 Wis.2d at 26, 313 N.W.2d at 64 (noting that a right to sell

"'consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell' or the authority to commit the grantor to a sale").

In *Kornacki v. Norton Performance Plastics*, the court also rejected the plaintiff's argument that he was protected under the WFDL. The appellate court observed that:

> The agreement between Kornacki and Norton calls Kornacki a "sales representative." Kornacki did not pay a franchise fee or make any capital investment in Norton. He did not maintain an office or showroom outside his home. He was paid on commission for sales he solicited, but did not assume any credit risk or collection responsibilities. Kornacki could only vary prices by decreasing his commission. The vast majority of sales were carried out through orders sent through the mails and accepted by Norton. Although he occasionally made rush deliveries, Norton shipped most products directly to customers. Kornacki incurred some advertising expenses, however he was not required to do so—advertising was Norton's responsibility under the contract.

956 F.2d 129, 133 (7th Cir. 1992). Similarly, the court was unpersuaded by evidence that 75% to 85% of the plaintiff's revenue came from selling the grantor's products. *Id.* at 132-33.

With regard to WFDL protection for distributors, courts have been limited in their willingness to read the statute's "right to distribute" language broadly. However, in *Moodie v. School Book Fairs, Inc.*, cited by Northland, the Seventh Circuit concluded that the plaintiff, a truck driver who delivered books to school fairs, qualified as a "distributor" within the meaning of the WFDL. Under the contract with the defendant, the plaintiff was the exclusive area dealer, and was required to maintain a place to store the books and to own a truck to haul the books. He "delivered them to their final point of sale, setting up the

11

books in the shelves from which the final consumer, the students, would choose their purchases." 889 F.2d 739, 744 (7th Cir. 1989).

On the other hand, in *Rakowski Distributing, Inc. v. Marigold Foods Inc.*, the court found "significant differences" between that plaintiff's situation and *Moodie*, and rejected the plaintiff's argument for WFDL protection. 193 F.3d 504, 508 (7th Cir. 1999). In that case, the plaintiff, a family-owned trucking company, devoted ten years of business to hauling and distributing dairy products for the defendant under two oral contracts. *Id.* at 505. The plaintiff served as the exclusive area hauler for the defendant, and made capital investments in specialized tractors and trailers to specifically handle the defendant's business, though the defendant never demanded such investments. *Id.* at 506. In addition, the plaintiff painted its trailers with the defendant's logo—which the defendant helped pay for—and installed a lift on one of its trucks at the defendant's request. In total, the business relationship constituted 45% of the plaintiff's total revenue and all of its profits. When the defendant later terminated its hauling agreement with the plaintiff, the plaintiff brought suit claiming protection as a "dealer" under the WFDL. The court rejected that argument:

> Unlike Moodie, Rakowski was not required to purchase trucks or to build storage facilities in order to satisfy the agreement, even though Rakowski found it convenient to do so. As far as the record shows, Marigold would have been equally satisfied if Rakowski had leased its trucks and facilities, as long as the products reached its customers in a timely and safe manner. By making the capital expenditures it did, Rakowski was able to increase its profits at the same time as it served Marigold more effectively. Perhaps most important, unlike Moodie, Rakowski's responsibilities under the hauling contract were limited to transporting Marigold products to Marigold's customers. Rakowski did not maintain its own inventory of Marigold's products, place Marigold products on customer

12

shelves, monitor customer inventories, or schedule future deliveries.

*Rakowski Distributing, Inc.*, 193 F.3d 504, 508 (7th Cir. 1999). Similarly, in *Van Groll v. Land O'Lakes, Inc.*, 310 F.3d 566, 569-70 (7th Cir. 2002), the court rejected the plaintiff-hauler's argument that he qualified as a "dealer" under the WFDL despite the fact that (1) the plaintiff invested substantially in specialized trucks to haul defendant's product; (2) it was granted exclusive rights to a specific territory; and (3) it was subject to a non-compete clause under its agreement with the defendant.

In striking similarity to the facts of this case, the district court in *E.A. Dickinson & Associates v. Simpson Electric Co.*, examined the entirety of the plaintiff's role as manufacturer's representative for the defendant, and concluded the WFDL was not applicable. The plaintiff in that case "engaged in the business of sales representation of manufacturers of electrical equipment." 509 F. Supp. at 1242. It promoted sales by finding and encouraging customers to place orders with the manufacturers. When the plaintiff first entered an oral contact with the defendant, the defendant had virtually no sales in Wisconsin; over the next twenty years, the plaintiff, serving as the defendant's exclusive representative for Wisconsin, helped increase sales in the region dramatically. The plaintiff paid no franchise fee and instead earned commission on sales of the defendant's equipment. It kept a small inventory of the defendant's supplies for promotional purposes and attended trade shows during which it would display the manufacturers' materials, including the defendant's. *Id.* at 1243. Despite the extent of the business relationship, the court found that the plaintiff was not covered by statute in as much as it was granted

13

neither the right to sell, distribute or use the defendant's commercial symbols as contemplated under the law.

Here, Northland acknowledges, as it must, that it was not able to commit Maax to a sale, (Pl.'s Mem. in Opp. 16); however, it creatively argues that under the circumstances, it "was the 'functional equivalent' of a Maax/Aker dealer," (Pl.'s Br. in Opp. 8). Toward this end, it encourages a broad reading of the word "distribute," and insists that the "totality of the circumstances" demand it be considered a "dealer" under statute. However, Northland presents only alleged dealership characteristics that have been rejected by courts interpreting the WFDL, and it offers no authority on point to justify a different outcome in this case.[5]

First, Northland points to evidence that "the Aker 'distribution network' itself was a very important aspect of the Maax acquisition of Aker." (Pl.'s Br. in Opp. 9.) It then presents a thorough discussion of why the Aker "distribution network" was desirable, including thoughts on the general reluctance of wholesalers to change manufacturers and the difficulty a new manufacturer has in "pioneering" a territory. (*Id.*) Aker's "distribution network" is tied to Northland, as the network was "primarily created by Gerald Mellone and Northland." (*Id.* at 11.)

On this point, the court does not doubt Northland played a large roll in developing a sales market for Aker products. Further, the court does not doubt that Maax had a business interest in acquiring Aker and accessing Aker's existing customer base; and that its purchase of Aker increased sales of Maax products (given that Aker products

---

[5] Northland acknowledges that the Wisconsin courts have applied a type of "totality of the circumstances" test only to the "community of interest" prong of the dealership analysis. (Pl.'s Br. in Opp. 16-17); *see Central Corp. v. Research Products Corp.*, 2004 WI 76, 272 Wis. 2d 561, 681 N.W.2d 178.

14

became Maax products) in Wisconsin.  However, that Northland invested many years into developing a sales market for Maax and its predecessor does not turn it into a dealer.  *See Kornacki*, 956 F.2d at 133 ("Kornacki has spent a long time developing customers for Norton and its predecessor, Halogen Insulator & Seal Corporation—he began representing Halogen in 1955.  This kind of good will, however, is not enough to make Kornacki a dealer under the WFDL."); *Id.* (rejecting dealer status despite investment by plaintiff in advertising for defendant); *Sales & Marketing Assocs.*, 57 F.3d at 607 (rejecting the plaintiff's argument that it qualified as a dealer when it created a new and unique market for the defendant, which the defendant then exploited after terminating the plaintiff); *E.A. Dickinson & Assocs.*, 509 F. Supp. at 1244-45 (rejecting dealership status despite twenty-five year standing relationship; the plaintiff had served as defendant's exclusive manufacturer's representative in Wisconsin the entire time, and "plaintiff was instrumental in building up the defendant's sales volume during that period from practically nothing to well over a quarter million dollars annually"[6]).

Next, Northland asserts that it "actively facilitated the delivery of Maax/Aker products to customers," and that "delivery" can qualify as "distribution" under the WFDL.  (Pl.'s Br. in Opp. 11.)  "Maax/Aker would ask Northland to meet its delivery trucks at a delivery site to ensure products would not be rejected by wholesalers for minor, easily

---

[6] The *E.A. Dickinson & Associates* court's reference to the longevity of the relationship, the plaintiff's exclusive rights to the territory, and the plaintiff's role in developing the market occurred during its discussion of the "community of interest" requirement.  However, the fact still remains that the court rejected E.A. Dickinson & Associates' assertion of WFDL coverage despite these attributes, finding that it could not establish it had a right to sell or distribute the defendant's products.  That Northland now asserts similar attributes as evidence that it had a "right to distribute" Maax products is inventive, but ultimately without merit.

repaired flaws or due to damage caused by shipping." (*Id.* at 12.) In addition, "Northland maintained a warehouse with doors and racks designed for use with Maax/Aker shower and whirlpool units and would occasionally take delivery of and store shower and tub units until Northland could make delivery to a job site or other destination." (*Id.*)

Northland's argument that "delivery" is deemed "distribution" for the purposes of the WFDL, cannot withstand scrutiny. There is there is no evidence that Northland, similar to the plaintiff in *Moodie*, was required under the agreement to purchase vehicles to deliver Maax' products and to build storage facilities to house Maax products. That Northland may have assisted Maax periodically with deliveries to wholesalers, stored certain Maax products in its facilities temporarily, and had access to a trailer which could be used to assist deliveries, are insufficient to grant dealer status. It remains that Maax was ultimately responsible for deliveries. (G. Mellone Dep. 111); *see, e.g., Kornacki*, 956 F.2d at 133 (rejecting dealer status where the plaintiff "occasionally made rush deliveries, [defendant] shipped most products directly to customers"); *Van Groll,* 310 F.3d at 569-70; *Ragowski Distributing, Inc.,* 193 F.3d at 508.

Northland further highlights that it was "expressly designated 'Territory Manager' of the Maax/Aker sales and marketing programs" and that it could "immediately approve requests for routine uses of the available Maax/Aker marketing allowances." (*Id.* at 13.) It adds that it was "required" to participate in Maax/Aker marking and that it spent "several thousand dollars and hundreds of hours a year" promoting Maax/Aker products. (*Id.*) However, despite Northland's initial approval of marketing allowances, Maax retained the authority for approving the allowances requested by wholesalers. (G. Mellone Dep. 296-97; S. Mellone Dep. 95-97.) Regardless, this does not relate to whether Northland

16

was granted a right to sell or distribute Maax products.  Further, that a plaintiff spent money promoting a defendant's products has been rejected by courts considering the issue; and here, Northland engaged in similar promotional activities for all of the manufacturers it represented.  *See Kornacki*, 956 F.2d at 133.

Changing gears a bit, Northland next asserts that it assumed "a significant amount of the warranty risk of every sale by performing a significant amount of warranty and service work," actions which can reveal a "right to sell" under the WFDL.  (Pl.'s Br. in Opp. 17.)  However, there is no evidence that Northland was required by Maax to offer and perform warranty work or to assume any warranty risk.  Indeed, the contract barred Northland from offering warranty other than the warranty provided by Maax, (*see* Rinehart Aff. Ex. G p 6.1-6.2), and any service work performed by Northland on Maax products was "on a gratis basis."  (G. Mellone Dep. 260; Pl.'s Mem. in Opp. 20.)  Northland's theory that the assumption of a "warranty risk" is equivalent to binding the grantor—the oft stated standard, which Northland was contractually prohibited from doing—fails under the circumstances.  *See Foerster, Inc.*, 105 Wis. 2d at 26, 313 N.W.2d at 64; *see also John Maye Co.*, 959 F.2d at 1405 (noting that the WFDL did not cover the plaintiff, even though it was contacted by defendant if a customer was late on payments, expected by the defendant to assist in collections, performed warranty service for free, charged for non-warranty service, and trained customers on the upkeep of the defendant's products).

In essence, Northland's argument is that it did more than required of it to benefit the business relationship.  Indeed, Northland considers itself one of the best representatives in the manufacturer's representation industry *because* it performs additional services that other representatives do not.  (G. Mellone Dep. 227.)  Similar to the

17

situations in *John Maye Co.* and *E.A. Dickinson & Associates*, that Northland "did more than required by the contract is insufficient to demonstrate a modification and a right to sell, as 'the performance of additional service-type functions by a manufacturer's representative does not suffice to bring one which neither sells nor distributes goods within the meaning of [the WFDL]." *John Maye Co.*, 950 F.2d at 1408 (*quoting E.A. Dickinson & Assocs.*, 509 F. Supp. at 1245; *see also Wilburn*, 719 F.2d at 265 ("Under *Foerster*, it is not sufficient that Wilburn did everything to sell the defendant's products but give final approval of the order.")).

Despite Northland's attempts, it cannot divorce itself from the definition of manufacturer's representative, "a position consistently excluded from the WFDL. . . . A manufacturer's representative has been defined as 'an independent contractor who solicits orders for a manufacturer's product from potential customers and is paid a commission on resulting sales.'" *John Maye Co.*, 959 F.2d at 1408 (*quoting M. Bowen & B. Butler, The Wisconsin Fair Dealership Law*, § 3.13, at 3-18 (1988)). Just as the plaintiff in *John Maye Co.,* Northland's role was to solicit orders for the defendant's products from existing and potential customers, and earn a commission on resulting sales. (*See* Rinehart Aff. Ex. G ¶ 4.3, 5; Rinehart Aff. Ex. F; G. Mellone Dep. 253-257.)

The WFDL was intended to protect "the type of 'dealership' . . . in which the entire business is built around and relies on the sale, servicing or representation of one grantor's products, such as gasoline service stations and fast food franchises." *Foerster*, 105 Wis. 2d at 27, 313 N.W.2d at 65. Here, Northland cannot establish that it was granted the right to sell, the right to distribute, or the right to use the defendant's commercial symbols to an extent anticipated by the law. Thus, it does not qualify as a dealer under the

WFDL. With that conclusion, it is not necessary for the court to address whether the parties have a community of interest.

### B. Contract Claims

In its Complaint, Northland asserts that the Sales Representation Agreement between Northland and Maax (1) must be rescinded for nonperformance,[7] and (2) that the contract is void due to duress and misrepresentation.[8] (Compl. 7.) However, in the wake of Maax' Motion for Summary Judgment, Northland appears to alter these claims in its Brief in Opposition to Summary Judgment, contending that the contract and the circumstances surrounding its execution, create issues of fact as to whether a community of interest exists under the WFDL. Specifically, Northland asserts that "[t]he contract Northland signed in 2003 did nothing to materially alter the circumstances of the 25-year relationship with Maax/Aker." (Pl.'s Br. in Opp. 28.) In apparent support of this contention, it contends, inter alia, that the contract lacked consideration and was signed under duress. (Pl.'s Br. in Opp. 28-31.) At no point in this section of its Brief in Opposition is it stated or implied that Northland seeks rescission of the contract, nor does Northland provide authority on which it would base an argument for rescission.

---

[7] As to this claim, Northland contends that consideration for the contract was Maax providing Northland the "exclusive right to sell the Manhattan and Collection lines of product." (Compl. ¶ 27.) However, "[a]t no time did Maax provide Northland with Manhattan or Collection product lists, price lists, or product brochures which would have allowed Northland to sell the lines prior to the date Maax announced" that another representative would be the exclusive sales representative for those lines in Northland's territory." (Compl. ¶ 28.)

[8] With regard to this second claim, Northland asserts in its Complaint that "Maax representatives advised Northland that it would not be allowed to continue selling Aker products unless it signed the Agreement to convert the relationship from a dealership under Wisconsin law to a sale representative." (Compl. ¶ 32.) It claims that this action "constituted duress thereby entitling Northland to rescind the Agreement." (*Id.*)

19

The genesis of Northland's contract attacks appears to be Maax' assertion that Northland is a "sales representative" because the contract so designates it as such.[9] Hence, Northland reasons that if the contract is void or rescinded, the contract may not be used as evidence that Northland is a sales representative and not a dealer. Regardless, pursuant to Wisconsin Statutes § 135.025(3), parties cannot attempt to contract around the WFDL. Section 135.025(3) provides that "[t]he effect of this chapter may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only." Because the court has determined that Northland does not qualify as a dealer under the WFDL irrespective of the designation in the contract, Northland's contention that the contract did not alter its long-term relationship with Maax.

Further, it is not apparent how Northland's claims that the contract lacked consideration and was signed under duress are relevant to its WFDL claim. However, should Northland still seek rescission of the contract as put forth in its Complaint—though it is unclear how Northland would benefit if the contract is indeed rescinded[10]—the court finds Northland's contentions lack support in the record.

---

[9] The argument appears as follows: Maax's attempt to designate Northland as a sales representative under the contract "fails for four principle reasons." (Pl.'s Br. in Opp. 28.) First, "the 'new contract' did not change anything about the relationship between the parties." (*Id.*) "Second, the WFDL does not permit the manufacturer to take away by contract the protections granted to a dealer under the Statute." (*Id.* at 29.) "Third, the facts are uncontroverted [sic] that the contract was without consideration, was obtained under duress, and was non-negotiable." (*Id.*) And fourth, "a jury can certainly infer from the record that Maax never intended to give the Manhattan line to Northland, even though it was promised in the contract." (*Id.* at 30.) Confusing, this section concludes with the argument that a jury should therefore be allowed to determine whether a "community of interest" exists. (*Id.* at 31, *quoting Central Corp. v. Research Products Corp.*, 2004 WI 76, ¶ 37, 272 Wis. 2d 561, ¶ 37, 681 N.W.2d 178, ¶ 37.) Again, at no point in this section does Northland argue that the contract should be rescinded, though it is otherwise unclear how the attacks on the legitimacy of the contract relate to this action.

[10] Northland does not indicate in its brief what benefits/remedies it seeks through rescission of the contract, and the court is only left to speculate as to how Northland sees this issue play out.

20

Gerald Mellone discussed the circumstances under which he signed the Agreement:

> Q: Now you think you signed the agreement at that meeting?
> A: Yes
> Q: Tell me the circumstances
> A: It was given to me by Gary Aker after the meeting was over, and he said, "You know, this is a matter of formality; it's a corporate thing. Here sign this. I know we worked on a handshake all these years, but this is corporate world time; and you've got to sign this."
> Q: Did you have any further discussion about it?
> A: No discussion
> . . .
> Q: Did you have any further discussion with Mr. Aker about the agreement at the time that your signed it?
> A: No
> Q: Why did you decide to sign it?
> A: It was half of my income. If I didn't sign it, I felt that I was in jeopardy; and I went along with the program.

(G. Mellone Dep. 179-81.)[11]

Under Wisconsin contract law, "[t]o establish . . . economic duress, a [party] must prove, by clear, satisfactory and convincing evidence, that there was a wrongful or unlawful act or threat that deprived him of his unfettered will." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 106, 293 N.W.2d 155, 158 (1980). Mellone's description of the events surrounding his signing of the contract falls well short of this standard.

---

[11] In addition, Stephen Mellone recalled that this meeting was "a big cheerleading session" with training sessions for representatives on the Maax product lines. (S. Mellone Dep. 64-65.) Toward the end of the meeting, Maax had break-out sessions in which each representative agency would meet with a Maax regional manager. It was at this meeting that Gary Aker presented Gerald and Stephen Mellone with the contract. (*Id.* at 66-67.) Aker said something to the effect of "Oh, Maax has this contract that they are requiring all reps to sign." (*Id.* at 66.) He also told the Mellones that Maax was happy with the Northland's performance and that while Northland was to lose territory in Minnesota, it would be able to sell Manhattan products along with Aker products. (*Id.* 67-69.) There was no further conversation about the contract. (*Id.* at 69-70.)

Likewise, Northland's claim that the contract lacked consideration because it was never given a "meaningful opportunity" to sell the Manhattan line lacks support. Northland agreed to serve as a representative of Maax/Aker on a commission basis, and indeed it represented Maax/Aker and received commissions on sales of Maax/Aker products. Moreover, Northland provides no authority to bolster its assertion that its lack of "meaningful opportunity to market the Manhattan line" requires rescission, and the court will not search for such support.

## PLAINTIFF'S MOTION TO SUPPLEMENT AFFIDAVITS OR IN THE ALTERNATIVE, FOR LEAVE TO TAKE FURTHER DEPOSITIONS

In addition, Northland filed a Motion to Supplement Affidavits in Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, Granting Plaintiff Leave to Take Further Depositions (Doc. # 51.) Northland contends that since submission of its Brief in Opposition to Defendant's Motion for Summary Judgment, it has discovered that Ryan Crowell, the Maax employee who notified Northland that it was terminated, has since joined a firm (Worley Associates) that recently joined with the firm that replaced Northland in representing Maax/Aker products in the region (Interstate Reps), and that the merger created a new firm (Fourmation Sales) which now represents Maax/Aker products in Wisconsin. (Pl.'s Mot. to Supplement Affs. 2.) Thus, it submits that a jury could infer that Maax, through Crowell, acted in "an unscrupulous and opportunistic manner in terminating Northland." (*Id.* at 3.) The affidavit is by Jeffery Mellone and indicates that the new firm employs Crowell and represents Maax/Aker, among other manufacturers.

Northland points to the Seventh Circuit's decision in *Frieburg Farm Equipment v. Van Dale, Inc.*, 978 F.2d 395 (7th Cir. 1992) for support. In that case the

court mentioned that a community of interest exists "only if [a dealer] has made the kind of investments that would tempt an unscrupulous grantor to engage in opportunistic behavior—in other words, to exploit the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Id.* at 399.

Northland's reliance on *Frieburg Farm Equipment* is misplaced: the language surrounding the above quote demonstrates the court's focus was on the substantial investment made by a dealer and the resulting economic consequences following termination by a grantor, rather than the motives of the grantor. Regardless, the proposed affidavit and related testimony is irrelevant to this court's determination that Northland does not qualify as a dealer under the WFDL.[12]

Therefore,

IT IS ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that this case is dismissed.

IT IS FURTHER ORDERED that plaintiff's motion to supplement affidavits is denied.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE

---

[12] The court also notes that, even without additional argument based on the supplemental affidavit, the plaintiff's Brief in Opposition exceeded the page limit set forth in Civil Local Rule 7.1(e) without court approval.